UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

CRIMINAL ACTION NO. 13-14-DLB-EBA

UNITED STATES OF AMERICA                                                            PLAINTIFF

vs.                       **MEMORANDUM OPINION AND ORDER**

JERRY L. PARKER, JR
DUSTIN R. COPLEY                                                                   DEFENDANTS

\*\*\*   \*\*\*   \*\*\*   \*\*\*

## I. INTRODUCTION

This matter is before the Court on Defendant Parker's Motion to Suppress (Doc. # 19) evidence seized during a traffic stop conducted on March 28, 2013 in Ashland, Kentucky. Defendant Copley has joined in Parker's motion (Doc. # 23).

On July 29, 2013, the Court held an evidentiary hearing to consider two issues: (1) whether the officer had probable cause to effectuate a traffic stop of the vehicle, and (2) whether the canine who positively alerted on the vehicle for the presence of a narcotic odor was properly trained and therefore reliable. During the hearing a third, related issue was raised by counsel. More specifically, Defendants also challenge the length of the detention, arguing that their continued detention to allow a canine to be summoned to conduct a canine sniff was unreasonable. Attorney Michael Curtis appeared on behalf of Defendant Parker, and Attorney Sebastian Joy appeared on behalf of Defendant Copley, each of whom were present. Assistant United States Attorney Elaine Leonhard appeared on behalf

of the United States.

Subsequent to the hearing, the parties submitted memoranda setting forth their respective arguments (Doc. # 29, 30). The motion is therefore ripe for decision. For the reasons set forth herein, the Court will **deny** Defendant's motion.

## II. FINDINGS OF FACT

(1) On the evening of March 28, 2013, Kentucky State Police Trooper Shane Goodall, Trooper Zachary Thompson, and Detective Chris Kirk were patrolling the area around the Greyhound bus station in Ashland, Kentucky, looking for suspected drug trafficking activity.[1]

(2) Shortly before 8:40 p.m. that evening, Detective Kirk advised Trooper Goodall that a white Lincoln Town Car was leaving the bus station. It was dark outside.

(3) Trooper Goodall pulled behind the Lincoln Town Car after it had exited the bus station. Once he had pulled in behind the vehicle, Goodall saw that the license plate was obscured by a tinted cover. The tinted cover made the plate illegible, especially at night.

(4) After following the vehicle for only a few blocks, Trooper Goodall made the decision to stop the Lincoln Town Car because he felt the license plate was not legible as required by K.R.S. § 186.170(1). As he was activating his lights, he observed the passenger, later identified as Defendant Parker, turn around, put his arm around the driver,

---

[1] The Court takes judicial notice that on March 27, 2013, one day before, Trooper Goodall seized approximately one-half kilogram of heroin and 120 oxycodone pills from a back pack that had been brought by a passenger who had arrived in Ashland on the Detroit bus. In that case, the passenger fled but the driver of the vehicle who picked up the passenger was convicted by jury on October 16, 2013 (*See United States v. Locklear*, Ash. Crim. 13-12-DLB). Trooper Goodall was the officer who initiated the traffic stop in Locklear and was therefore familiar with that drug seizure the night before.

later identified as Defendant Copley, and place something behind on the back seat on the driver's side.

(5) Once the Lincoln Town Car was stopped, Trooper Goodall was able to make out the registration, which, when relayed to dispatch, came back as not on file.

(6) Trooper Goodall then approached the vehicle and asked the driver and passenger for identification. They complied, Copley handing Trooper Goodall his Huntington, West Virginia drivers license, and Parker providing him a Detroit, Michigan identification.

(7) Once Trooper Goodall had identified both subjects he asked Copley to exit the vehicle. Copley told Trooper Goodall that he had just picked up Parker at the bus station and they were headed to Parker's brother's residence on Thirteenth Street in Ashland. However, Copley could not provide any street address.

(8) Trooper Goodall then proceeded to speak with Mr. Parker, who was still in the vehicle. Parker told Trooper Goodall the exact same story, that he had been picked up by Copley at the bus station and they were going to his brother's house on Thirteenth Street. However, he did not know the street address for his own brother's house. That Parker did not know his brother's address piqued Goodall interest.

(9) At this point in the encounter Trooper Goodall asked Copley for consent to search the vehicle. Copley declined. After Copley refused consent, Trooper Goodall requested Parker exit the vehicle and sit down on the curb behind the vehicle next to Copley. Approximately five (5) to eight (8) minutes had elapsed since the traffic stop began.

3

(10) Trooper Goodall then summoned KSP canine handler Shawn Podunavac to the scene so his narcotics canine, Chuck, could perform a canine sniff on the outside of the vehicle. Because he was in an adjacent county at the time he was contacted by Goodall, it took Podunavac between twenty (20) and twenty-five (25) minutes to arrive on the scene with Chuck.

(11) Upon arrival on the scene, Trooper Podunavac instructed canine Chuck to perform a canine sniff on the vehicle. Chuck alerted on the seams between the doors on both sides of the vehicle.

(12) At the time of the canine sniff here, Trooper Podunavac and Chuck had been paired with each other for six (6) years. Podunavac had received extensive training by the previous KSP canine handler in Ashland as well as completed training courses at the Southern Ohio Police Canine Center.

(13) Chuck was trained using the U.S. Customs method for detection of narcotic odors using the KSP training certification standard. Chuck was trained annually every year for all six years he was paired with Podunavac. Chuck also received weekly maintenance training from the KSP. This training included locating narcotics in buildings, rooms, vehicles and parcels. Chuck never had any problems with maintaining his certifications.

(14) Chuck was certified to detect cocaine, methamphetamine, heroin, marijuana, and ecstacy. Although he is not specifically trained to detect prescription pills, Podunavac testified that because the binding agents used in ecstacy pills are also commonly used in prescription pills, he has alerted positively to prescription pills numerous times.

(15) Chuck's success rate in locating narcotics was approximately 95%, meaning that 5% of the time he alerted on something it was a false positive. Podunavac explained

4

that those false positives were likely attributed to drugs that had been recently removed from the items being sniffed.

(16) After being advised that Chuck had positively alerted on the vehicle, Trooper Goodall proceeded to search the vehicle. During that search the officers located 592 oxycodone pills and 90 xanax pills hidden inside a Cheetos bag. That bag was found inside a subway bag filled with trash in the back seat of the vehicle. Upon locating the pills, Copley and Parker were arrested.

(17) According to the Uniform Citation, the defendants were arrested at 9:13 p.m., thirty-three (33) minutes after the stop was initiated.

### III. ANALYSIS

#### A. The initial stop did not violate Defendants' Fourth Amendment rights.

Defendants argue that the initial traffic stop violated their Fourth Amendment right to be free from an unreasonable search and seizure. The government responds that the stop was lawful because Trooper Goodall had probable cause to believe that Defendant violated K.R.S. § 186.170(1), which states in pertinent part:

> . . . Plates shall be kept legible at all times and the rear plate shall be illuminated when being operated during [designated hours]. . . .

In support of this assertion, the government points to Trooper Goodall's testimony that because the vehicle had a tinted license plate cover it was difficult to read, making it illegible.

The Sixth Circuit requires an officer to have probable cause that a traffic violation has occurred before he may make a traffic stop. *United States v. Hughes*, 606 F.3d 311 (6th Cir. 2010), *see also United States v. Bradshaw*, 102 F.3d 204, 210-211 (6th Cir. 1996)

5

(citing *United States v. Ferguson* , 8 F.3d 385, 391 (6th Cir. 1993) (en banc)).

Although the Sixth Circuit has not specifically addressed what constitutes probable cause to believe a vehicle is in violation of K.R.S. § 186.170(1), the Kentucky Court of Appeals has on at least two occasions. First, in *Jackson v. Commonwealth*, the vehicle's license plate was in the rear window, but placed in such a way that the number was not visible. No. 2008-CA-002262-MR, 2009 WL 2569208 (Ky. App. Aug. 21, 2009). The Court of Appeals upheld the traffic stop because police had reasonable suspicion that the driver violated K.R.S. 186.170(1). In *Shields v. Commonwealth*, the Court held that when a license plate is covered in mud, it is not "legible" for purposes of the statute and thus justified the traffic stop. No. 2005-CA-002300-MR, 2007 WL 866464 (Ky. App. Mar. 27, 2007). Although the Kentucky reasonable suspicion standard is less than necessary here, the Court finds these two cases are instructive.

Additionally, other jurisdictions have upheld traffic stops based on similar circumstances. In *United States v. Dexter*, 165 F.3d 1120 (7th Cir. 1999), the vehicle's license plate was not easily seen because it was behind a tinted window. The Seventh Circuit upheld the stop, finding probable cause to believe a violation of Wisconsin law occurred. *See also United States v. Cano*, 364 Fed. Appx. 490 (10th Cir. 2010) (finding that license plate was not "clearly legible" as required by statute because it was obscured by a tinted window). In a very factually analogous case, the Tenth Circuit in *United States v. Castro-Holguin*, 94 Fed. Appx. 788 (10th Cir. 2004) rejected a Fourth Amendment challenge to a traffic stop because the tinted license plate cover obstructed the visibility of the license plate.

Similarly here, Trooper Goodall had probable cause to believe that Defendants' vehicle was in violation of K.R.S. § 186.170(1) because it was obscured by a tinted cover, which made the plate illegible. Accordingly, the initial stop did not violate Defendants' Fourth Amendment rights.

### B. The length of the subsequent detention was reasonable under the circumstances.

In addition to challenging the initial traffic stop, Defendants also argue that Trooper Goodall violated their Fourth Amendment rights by ordering them out of the car and continuing the investigation beyond the scope of the initial stop. Defendants contend that they were detained longer than necessary to effect the purpose of the investigatory stop, and therefore the detention transformed into a de facto arrest that was not supported by probable cause. Defendants rely heavily upon the Sixth Circuit's decision in *United States v. Buchanon*, 72 F.3d 1217 (6th Cir. 1995) in support of their argument. The government responds that Defendant's Fourth Amendment rights were not violated because the questioning was permissible and the duration of the stop was reasonable to enable the canine handler to bring his narcotics canine to the scene to conduct a canine sniff.

As an initial matter, Trooper Goodall lawfully ordered Defendants out of the vehicle after making the traffic stop. It is firmly established that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977). This rule protects the safety of the officer while causing a minimal intrusion on the driver, who has already been lawfully detained. *Id.* at 111.

Defendants' reliance on *Buchanon* is misplaced. In that case, the defendant's truck was broken down on the highway when an officer stopped to render assistance. There was absolutely no hint of wrongdoing by the occupants of the truck when the officer called another police unit to carry out a canine sniff investigation. 72 F.3d at 1221. Eventually, several officers detained the stalled truck's occupants pending the canine sniff. The Sixth Circuit found the dog sniff in *Buchanon* was "the result of the exploitation of the primary illegality." *Id.* at 1226. The Sixth Circuit concluded that using a dog in this manner was unlawful because the "troopers did not have reasonable articulable suspicion for seizing the defendants and the truck for a limited investigatory purpose." *Id.*

The facts here are distinguishable from *Buchanon* because Trooper Goodall had reasonable suspicion to briefly detain Parker and Copley based on the totality of circumstances. In this case, officers were investigating arriving bus passengers from Detroit, Michigan because of a recent influx of drugs and pills coming from Detroit. In fact, a large quantity of heroin and oxycodone pills were seized from a passenger who had arrived on the Detroit bus the night before. Trooper Goodall further knew that Copley had picked up Parker on that very same arriving Detroit bus. As Goodall was activating his lights to effectuate the traffic stop, he observed Parker turn around and place something behind on the back seat on the driver's side. These furtive movements made in response to Trooper Goodall's activation of his blue lights can be considered in determining the legality of the traffic stop and subsequent detention. *See United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) ("Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions."); *United States v. Edmonds*, 240 F.3d 55, 61 (D.C.Cir. 2001) (finding that an officer's observation of the defendant ducking

8

and reaching under his seat and then sitting up after the officer made his presence known could be considered in a totality of the circumstances analysis).

After effectuating the stop, Trooper Goodall confirmed that Copley, a resident of Huntington, had picked up Parker from the bus station, Parker was from Detroit, and that they were headed to Parker's brother's residence on Thirteenth Street in Ashland. However, neither Parker nor Copley could not provide a street address for Parker's brother's residence, a point which also piqued Goodall's suspicions. Goodall also thought it was unusual for Copley to come from Huntington to pick up Parker in Ashland when the very next stop on the bus route was Huntington.[2]

As set forth above, Parker's arrival from a source city for drugs, on a bus that had very recently produced a large quantity of narcotics, Parker's furtive movements upon activation of Goodall's blue lights, and Copley and Parker's inability to provide a street address for Parker's own brother provided Goodall with reasonable suspicion that Parker and Copley may be involved in criminal activity, and the subsequent canine narcotics sniff was directly related to investigating that suspicion. *See United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). Accordingly, Trooper Goodall was permitted by the principles of Terry briefly to detain Copley and Parker for investigative purposes. *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005).

Goodall's detention of Copley and Parker and Copley's Lincoln Town Car for the purposes of the drug-dog sniff was relatively brief. There was, at most, a twenty-five minute wait for Trooper Podunavac to bring his narcotics canine, Chuck, to the scene to

---

[2] The Court discounts this fact because there is no proof in the record that Parker had a bus ticket from Detroit to Huntington.

perform a canine sniff on the outside of the vehicle.  Based on Sixth Circuit precedent, the length of this detention was reasonable. *See Garcia*, 496 F.3d at 504 (holding that "the duration of the stop was reasonable [because] the canine sniff was performed within a half hour of the stop, and we have previously upheld an investigatory stop that included a thirty-five minute wait for the canine unit"); *Davis*, 430 F.3d at 354 (concluding that "the police had reasonable suspicion to detain [the defendant] for the additional approximately thirty to forty-five minutes it took for the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics"), *see also United States v. Avery*, 137 F.3d 343, 350-51 (6th Cir. 1997) (finding that twenty-five minute detention while waiting for drug-sniffing dog was reasonable); *United States v. Knox*, 839 F.2d 285, 290 (6th Cir. 1988) (finding that thirty minute wait was reasonable).

    **C.**    **The positive canine alert by Canine Chuck provided probable cause to search Defendant's vehicle.**

The search of Defendant's vehicle was justified based on the "automobile exception" to the warrant requirement, which excuses the police from obtaining a warrant when they have probable cause to believe that a stopped vehicle contains evidence of a crime. *See United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994).  "An alert by a properly trained and reliable drug-detection dog 'is sufficient to establish probable cause for the presence of a controlled substance.'" *United States v. Stubblefield*, 682 F.3d 502, 505 (6th Cir. 2012) (*quoting United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)).  A dog's training and reliability can be established by the testimony of the dog's handler alone. *Diaz*, 25 F.3d at 396.

Moreover, under the flexible, common-sense standard for determining probable cause, the showing of the reliability of a drug-detection dog's alert does not require an exhaustive set of records, including a log of the dog's field performance, and instead, the dog's certification by a bona fide organization after testing in a controlled setting allows a court to presume, subject to any conflicting evidence offered, that the dog's alert provided probable cause to search. *Florida v. Harris*, 133 S.Ct. 1050, 1057, 185 L.Ed.2d 61 (2013). In *Harris*, the Supreme Court addressed how a court should evaluate probable cause based on an alert from a drug-detection dog when the defendant has challenged the dog's reliability, such as here. *Id.* at 1053. The Supreme Court rejected Florida's rigid test that required the state in every case to present exhaustive evidence of reliability in favor of a more flexible, common-sense approach that examines the dog's training. *Id.*

Based on the testimony of Trooper Podunavac, and consistent with the Supreme Court's recent decision in *Harris*, the Court concludes that canine Chuck was properly trained and reliable, and therefore his positive alert on the vehicle in this case provided probable cause for the search. At the time of the canine sniff here, Trooper Podunavac and Chuck had been paired with each other for six years. Podunavac had received extensive training by the prior Kentucky State Police canine handler in Ashland in addition to completing training courses at the Southern Ohio Police Canine Center.

Canine Chuck was trained annually for each of the six years he was paired with Trooper Podunavac, using the U.S. Customs method for detection of narcotic odors using the KSP training certification standard. In addition to the yearly certifications, Chuck also received weekly maintenance training at the Kentucky State Police, which included locating narcotics in buildings, rooms, vehicles and parcels. Chuck never had any problems with

11

maintaining his certifications. Chuck was certified to detect cocaine, methamphetamine, heroin, marijuana, and ecstacy. Although he was not specifically trained to detect prescription pills, because the binding agents used in ecstacy are commonly used in prescription pills, Chuck has alerted positively to prescription pills numerous times. According to Trooper Podunavac, Chuck's success rate in locating narcotics was approximately 95%, meaning that 5% of the time he alerted on something it was a false positive. Podunavac explained that those false positives were likely attributed to narcotics that had been recently removed from the items being sniffed. Based on Trooper Podunavac's explanation, these minimal false positives do not indicate that Chuck was unreliable. Rather, they are a logical by-product of the fact that the scent of narcotics may permeate the area surrounding where they were after being removed.

Moreover, during the hearing, neither Defendant offered anything directly, or in cross examination, to undermine the Government's proof that canine Chuck and his handler were properly trained or reliable. Under this record, the proof elicited at the hearing was more than adequate to meet the standards set forth in *Harris*. Canine Chuck's positive alert on the vehicle provided probable cause.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1) Defendants' Motion to Suppress (Doc. # 19) is hereby **DENIED**;

(2) The time period between July 17, 2013 and October 21, 2013, totaling ninety-six (96) days, is deemed "excludable time" pursuant to 18 U.S.C. § 3161(h)(1)(D);

(3) This matter is set for a **Jury Trial** on **November 18, 2013 at 1:00 p.m.** in **Ashland**, with the attorneys present at 12:30 p.m.

This 21st day of October, 2013.



G:\DATA\ORDERS\Ashland Criminal\2013\13-14 MOO re DE 19.wpd